

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-28-2009

# Kamienski v. Hendricks

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-4536

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Kamienski v. Hendricks" (2009). *2009 Decisions.* Paper 1299.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1299

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4536
_____

PAUL KAMIENSKI,
                              Appellant

v.


ROY L. HENDRICKS, Administrator;
ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
OCEAN COUNTY PROSECUTOR'S OFFICE


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 02-cv-03091)
District Judge: Stanley R. Chesler

_____

Argued April 16, 2009

Before:   McKEE, SMITH, and VAN ANTWERPEN, *Circuit Judges.*

(Filed: May 28, 2009)


Timothy J. McInnis, Esq. (Argued)
Law Office of Timothy J. McInnis
521 Fifth Avenue, Suite 1700
New York, NY 10175
        *Counsel for the Appellant*

Samuel J. Marzarella, Esq. (argued)
Marlene Lynch Ford
Prosecutor of Ocean County New Jersey
119 Hooper Avenue
P.O. Box 2191
Toms River, NJ 08754
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

McKee, *Circuit Judge*

Paul Kamienski appeals from the final order of the United States District Court for the District of New Jersey denying his petition for a writ of habeas corpus. In that petition, Kamienski challenged the sufficiency of the evidence to support his 1987 conviction for murder and felony murder in New Jersey state court. The sole question certified to us on appeal from the order denying habeas relief is whether the evidence was sufficient to prove Kamienski guilty of first degree murder and felony murder beyond a reasonable doubt. Based upon our careful review of the record, and despite the very deferential standard that limits our inquiry, we believe that no reasonable juror could conclude that the evidence admitted against Kamienski at his trial established that he was guilty of murder or felony murder beyond a reasonable doubt, and the New Jersey courts' conclusion to the contrary is an unreasonable application of clearly established Supreme Court precedent. Accordingly, as we shall explain below, we hold that the district court erred in denying Kamienski's petition, and we will therefore remand to the district court

2

with instructions to grant relief.[1]

## I. Factual Background[2]

On September 24, 1983, the body of Henry "Nick" DeTournay was recovered from the waters of Barnegat Bay in New Jersey. The body was wrapped in a blanket and a sleeping bag and tied to a cement block, and Kamienski's business card was found in one of Nick's pockets. Writing on the back of that card referred to an apartment phone number and a "boat" phone number for "Paul and Donna." The following day, Barbara DeTournay's body was found in the bay wrapped in a brown blanket not far from where Nick's body had been recovered. Subsequent investigation established that both Nick and Barbara DeTournay had been killed by multiple gun shot wounds inflicted several days before their bodies were discovered.

The ensuing investigation by the Ocean County Prosecutor's office eventually focused on Paul Kamienski, Anthony Alongi and Joseph Marsieno.[3] Investigators developed the theory that the DeTournays had been killed in the course of a large drug deal. However, investigators were not able to formally charge anyone for the murders

---

[1] We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253.

[2] Since the only issue before us is the sufficiency of the evidence, we must set forth the evidence that was developed at trial in some detail. We must state the facts in the light most favorable to the government, and draw all reasonable inferences from those facts in the government's favor.

[3] Joseph Marsieno is also referred to as "Marzeno" and "Marseno" in various places in the record. Like the district court, we shall refer to him as "Marsieno."

3

until October of 1987 when Kamienski, Alongi, and Marsieno were charged with robbery, murder and conspiracy to distribute the cocaine that the DeTournays had been trying to sell.

Thereafter, the three defendants were tried jointly. Donna Duckworth, who was Kamienski's girlfriend from 1981 to 1987, was the main witness against Kamienski. Kamienski and Duckworth "partied" regularly and frequently shared cocaine. Duckworth and Kamienski met the DeTournays in the summer of 1982 when the DeTournays docked their boat at the New Jersey marina where Kamienski kept his boat. In 1983, Nick DeTournay visited Kamienski on his boat a few days before Labor Day to inquire if Kamienski knew anyone interested in purchasing a large quantity of cocaine, and Kamienski stated that he did. During the summer of 1983, Kamienski was buying the cocaine he and Duckworth used from Marsieno and Alongi, whom they had met previously.

During a Labor Day weekend party, Kamienski took the DeTournays to Alongi's home and introduced them to Alongi. During that meeting Kamienski vouched for Alongi to the DeTournays, and he also vouched for the DeTournays to Alongi.

Christine Longo, Barbara DeTournay's sister, testified that Barbara DeTournay had told her that she (Barbara) had spent time during the Labor Day weekend on the boat

4

of a friend named "Paul," who was a funeral director.[4]  Thereafter, Barbara advised Christine that she and her husband were trying to sell some cocaine and that they would "be set for life" because of a cocaine deal they had arranged.  Longo did not know how much cocaine was involved, but she could tell that it was a "large quantity."

Duckworth testified that on September 9, a few days after Labor Day, she heard Kamienski telling someone on the phone "he didn't have a scale and to get off the boat." When Duckworth inquired, Kamienski told her that he had been speaking to Nick DeTournay.  Phone records that were admitted into evidence showed a call from Kamienski to the residence where the DeTournays were staying on September 9, 1983. There is no further indication in the record of communications between Kamienski and the DeTournays between September 9 and September 19, 1983 when the DeTournays were murdered.

Kamienski and Duckworth attended a party at Alongi's house on Saturday, September 17, and there was talk about good quality cocaine becoming available in the very near future.  According to Duckworth, Marsieno and Alongi were the ones who spoke of the upcoming deal.  "Buddy" Lehman, a user who purchased cocaine from Alongi, also heard Alongi make these statements.   Marsieno told his girlfriend, Jeanne Yurcisin, that "he was expecting to get a great deal of cocaine, that it was supposed to be

---

[4] It is clear from all of the testimony that the "Paul" that Christine was referring to was Paul Kamienski.

very good, and it was supposed to burn at 88 to 92 percent, and it was coming up from Florida from friends of Paul and Donna's."

Jeffrey Sidney was the associate of the DeTournays' responsible for driving the cocaine from Florida to New Jersey where he checked in to the Holiday Inn in Toms River. He testified for the prosecution under a grant of immunity. According to Sidney, the drug deal was initially scheduled for Sunday, September 18. On that day, he met Nick in the parking lot of the Holiday Inn at 11:30 a.m., but Nick told him that the "people still weren't ready and they were getting their money together." At 4:00 p.m. on the 18th, Jeanne Yurcisin received a telephone call from Marsieno, in which Marsieno told her to "pick him up at the Holiday Inn" and "to be there at eight o'clock, not to be a minute late, because he would be carrying."

According to Duckworth's testimony, she and Kamienski spent the day of the 18th on Kamienski's boat and then met Alongi, Marsieno and Jackie Sullivan[5] at the bar of the Holiday Inn Hotel for drinks around 6:00. Duckworth could not recall what the men talked about, as she interacted primarily with Sullivan. However, there was no testimony that anyone at that meeting discussed the pending cocaine transaction. There was also no testimony that Kamienski met with the DeTournays on the 18th or ever told anyone (including Duckworth) about any meeting with the DeTournays on the 18th.

---

[5] Jackie Sullivan was Alongi's girlfriend in 1983. By the time of the trial, the two had married and Jackie Sullivan became Jackie Alongi. Both names appear in the record and the briefing, but refer to the same person.

Jeanne Yurcisin, Marsieno's girlfriend, testified that she did pick Marsieno up at 8:00 that evening from the Holiday Inn as instructed and that he was carrying a briefcase. Yurcisin testified: "as we were pulling away, he said, those lousy MF'ers, He said that they wanted to see the money first, and that he -- he had no intention of paying them any money, that he would kill them before they got any of his money." Yurcisin also testified that later, at his condo, Marsieno opened the briefcase and that it contained only a gun and no money.

As noted above, the drug deal was postponed from September 18, to Monday, September 19, at 3:00 p.m. according to Sidney, the drug courier. On the 19th, the deal was further delayed until later in the afternoon. At 5:00 p.m. on the 19th, Barbara was dropped off at the Holiday Inn to meet Sidney and collect the cocaine. She told Sidney that instead of Nick coming back with the money, a "distinguished man" would be picking her up. Thereafter, Sidney saw Barbara get into a car matching the description of Alongi's car around 5:00 p.m. Sidney never saw or heard from either of the DeTournays again.

Alongi's neighbor, Mr. Hunt, testified that he saw Nick's car pull into Alongi's driveway and saw Nick get out of the car and shake Alongi's hand sometime between 3:00 and 6:00 p.m. on Monday, September 19.

Duckworth testified that Kamienski drove her to a friend's house and dropped her off there at about 2:30 p.m. on the 19th. She testified that this was unusual because

Kamienski's license was suspended and he never drove. Furthermore, the two of them were virtually inseparable during that period as they were always together.

According to Duckworth, Kamienski subsequently picked her up and brought her to the Alongi residence around "dusk," and Kamienski then directed her to wait in the kitchen with Jackie Sullivan. However, Duckworth did not heed his instruction. Rather, she went outside towards the dock where she saw Kamienski "standing by the dock" looking towards Alongi, who was in a boat.[6] She saw a blanket and sleeping bag in the boat and "what appeared . . . to be a body shape in the sleeping bag." The sleeping bag was blue and she also saw a brown blanket in the boat. The dock was wet. Alongi started to lunge at Duckworth when he saw her, but Kamienski told Alongi that Duckworth was "alright," and she went back inside.

After Duckworth returned to the house, she and Sullivan went to the mall and then to a liquor store. When they returned, Marsieno was also there, and they all shared drinks. According to Duckworth, Alongi took her upstairs and showed her a gun, a phone that said "hitman" on it, and then warned her: "if I didn't be quiet, I'd end up like my friends." Alongi also told Duckworth that "Paul wouldn't be able to save me if I open my mouth . . . ."

When Kamienski and Duckworth left Alongi's house that evening, Duckworth

_____

[6] Presumably, this was the black marquis boat that belonged to Sullivan's brother which the government believes was used to dump the DeTournays' bodies into the bay.

asked Kamienski what happened. Kamienski responded by telling her: "he couldn't control what happened" and added that "Nick went first, Barbara didn't suffer." Kamienski then warned her: "if we didn't shut up that he wouldn't be able to save me or himself." Upon returning to Kamienski's boat, Duckworth noticed that it was harder to board the boat than usual because it had been moved slightly forward in its berth and a box which contained polishing towels and rags had been moved.

Duckworth also testified that cocaine became very plentiful in late September after this incident, and Kamienski was looking for a "grinder" after the murders.[7] There was also testimony that after the murders, Marsieno would give small amounts of cocaine to both Alongi and Kamienski without asking for payment.

Duckworth also recounted that on October 1, 1983, she, Marsieno, Kamienski, Alongi, Sullivan, and Yurcisin met at a restaurant. There, she heard Marsieno state: "[t]hey were like scared puppies . . . it was easy." When Duckworth exhibited some discomfort, Marsieno told her to "straighten up or [she] could end up like them . . .".

Duckworth also testified that the day Nick DeTournay's body was found and the police came to question Kamienski, he instructed her to call Alongi. Telephone records show that Kamienski called Alongi 5 times in the 6 days following the discovery of the bodies. Finally, Buddy Lehman - a member of Paul and Donna's social circle - testified

_____

[7] According to Duckworth's testimony, a "grinder" is an appliance that is used to convert rock cocaine into powder. Sidney testified that the DeTournays' cocaine was in rock form.

9

that the same day Nick's body was found (but before Barbara's body was recovered), Kamienski told him: "[M]y *friends* from Florida have been murdered." (Emphasis added).

Duckworth's testimony included the fact that the blankets the DeTournay's bodies were wrapped in when discovered were similar to blankets that she had seen on Kamienski's boat. She also stated that a towel that was found with the bodies resembled one she had seen Kamienski use to polish his boat, and she testified on direct that the hitch knots depicted in photos of the recovered bodies that were used to tie the bodies to cement blocks were the "same type of knots that [Kamienski] would tie."[8]

There was more testimony at trial regarding evidence linking Alongi and Marsieno to the crimes, but that evidence was not admitted against Kamienski and has no bearing on Kamienski's appeal.[9]

_____

[8] The government makes much of this testimony on appeal. *See* State's Br. at 36-37 ("Duckworth had been boating since age five and was familiar with how to secure boats and the knots boaters used to secure them. Kamienski used a peculiar 'hitch' knot to secure a boat, rather than that taught to Duckworth.") However, the state's selective reliance on that testimony is misleading because Duckworth conceded on cross examination that there was nothing unique about the knots, and that the hitch knot is a common boater's knot. When asked if she had seen other people tie knots like the ones used to secure the bodies, she responded that she had in "many circumstances." Accordingly, the fact finder could only conclude from that portion of her testimony that Kamienski knew how to tie a common "hitch knot," used in boating.

[9] In fact, throughout its brief, counsel for the government has used the term "defendants" in a manner that included Kamienski without specifying which of the three defendants the evidence refers to. In several of those references, the evidence being discussed pertained only to Marsieno and/or Alongi, and not to Kamienski. Moreover, the government's brief frequently includes facts based on testimony that was admitted

## II. Procedural History

In October, 1987, approximately four years after the killings, a grand jury sitting in Ocean County, New Jersey, returned an indictment against Paul Kamienski, Anthony Alongi, and Joseph Marsieno. The indictment charged each defendant with two counts of first degree murder, one count of felony murder, conspiracy to commit murder and/or robbery, and conspiracy to possess cocaine with the intent to distribute. The prosecution's theory at trial was that Marsieno committed the murders during a drug deal for three kilograms of cocaine and that Alongi and Kamienski were accomplices to the robbery and the murder.

Although it is not determinative of our inquiry into the sufficiency of the evidence supporting Kamienski's convictions for murder, or felony murder, it is nevertheless instructive to note that the prosecutor made the following argument during his closing to the jury:

> Paul Kamienski was there when [the DeTournays] were murdered. Paul Kamienski was there because he put this deal together, he had brokered it, the DeTournays trusted him. He was the person they trusted.

* * *

---

only against Marsieno and/or Alongi. Although counsel does note that such evidence was admitted only against the other defendant(s), it is clearly irrelevant in determining if the evidence admitted against Kamienski was sufficient. Moreover, including such evidence in the brief is both unhelpful and misleading as only Kamienski's appeal is before us. Counsel for the government has consistently either misunderstood or ignored the limitations and propriety of including such evidence responding to Kamienski's appeal.

11

*Am I going to say does Paul Kamienski know that they're going to get killed? I don't think so. Not from the evidence and testimony that I've heard.* Paul Kamienski is there because he is part and parcel, he put this drug deal together, he made it work, he was there.

And you know what, Tony [Alongi] and Joe [Marsieno] they didn't have any money, but you know what they had, they had a gun and they killed the DeTournays. They murdered them. They murdered them in cold blood. And Kamienski was there and that didn't end the murder, a bullet through the chest or through the head did not end a murder, a murder is finished and the murder ended when that body is disposed of. And I submit to you that's what occurred at that point in time was that Paul Kamienski assisted Marzeno and Alongi in getting rid of the bodies. That he assisted, he helped, he rendered his countenance to that in getting rid of the bodies. He was there. He never-*I'll say this, he never expected it to happen, he didn't expect them to be murdered.* He said that to Donna as soon as they got outside. I couldn't control the situation, but it happened. And he was there and he helped dispose of the bodies.

\*\*\*

*... I've indicated to you that I don't think that Paul Kamienski - - I don't think that [he] was a part of a conspiracy to murder those people, I think he very clearly was a part of the conspiracy, that second conspiracy to possess that cocaine with intent to distribute it.*

(Emphasis added). The jury acquitted all defendants of the charges of conspiracy to commit murder and conspiracy to commit robbery. However, the jury convicted the defendants of felony murder, and conspiracy to possess cocaine with the intent to distribute. Marsieno was found guilty, as the principal actor, of murder in the first degree. Kamienski and Alongi were found guilty as accomplices to murder in the first degree.

Thereafter, the trial court granted post-verdict motions filed by Kamienski and

12

Alongi in which they each requested judgments of acquittal on the murder convictions, or in the alternative, a new trial on those charges. During oral argument on those post-verdict motions the prosecutor agreed with the following statement by the trial court: "prior to the afternoon of the 19th there was nothing suggesting that [Kamienski] knew of and agreed to assist in or conspired to commit a robbery or a murder . . . [a]nd the jury so found." Accordingly, the district court granted Kamienski's motion for judgment of acquittal on the murder charges.

The court reasoned that since the jury acquitted Kamienski on the conspiracies to rob and murder, the state was required to show some evidence of Kamienski's conduct before, during or after the murders to establish his guilt as an accomplice to the murders.[10] However, the court concluded that there was insufficient evidence to convict Kamienski of accomplice liability for either murder or felony murder. In reaching that decision, the court expressed concern about portions of the jury charge on accomplice liability. However, the court held that it could not order a new trial based upon the purportedly erroneous jury charge because the state had not produced sufficient evidence to establish Kamienski's guilt for murder or felony murder. Thus, the court entered a judgment of acquittal on those charges in favor of Kamienski.

The state appealed, and the Appellate Division reversed and reinstated

---

[10] The prosecutor agreed that disposing of the bodies after the fact, absent something more, was not sufficient for accomplice liability for murder thereby retreating from the "continuing crime" of murder theory that he had argued to the jury.

Kamienski's murder convictions. The Appellate Division found no error in the jury charges and concluded: "where a jury is instructed properly, an acquittal under a theory of conspiracy does not as a matter of law preclude a conviction as an accomplice."[11] *State v. Kamienski*, 603 A.2d 78, 80 (N.J. Super. Ct. App. Div. 1992). The Appellate Division believed that the evidence was sufficient to convict Kamienski of accomplice murder and/or felony murder, and it therefore reinstated Kamienski's murder convictions. *Id.* 89-95. Thereafter, the New Jersey Supreme Court refused Kamienski's application for review of the decision of the Appellate Division.

After exhausting his state remedies, Kamienski filed a timely petition under 28 U.S.C. § 2254 in the United States District Court for the District of New Jersey. He challenged his murder convictions on several grounds, including the sufficiency of the evidence. The district court denied the petition because it did not believe that the New Jersey Appellate Division's holding was an unreasonable application of federal law under AEDPA. It explained: "[a]s set forth in the Appellate Division's discussion, there is evidence from which a reasonable jury could have found efforts by Kamienski to facilitate the robbery and murder."

---

[11] The Appellate Division believed that the trial court granted Kamienski's motion for a judgment of acquittal because the jury verdict was inconsistent. However, the court did not grant relief because of inconsistent verdicts (which are allowed); rather, the trial court granted judgment of acquittal based upon its conclusion that the prosecution had not produced sufficient evidence to establish Kamienski's guilt on those charges beyond a reasonable doubt.

Thereafter, the District Court granted a certificate of appealability "on the question of whether [Kamienski's] criminal conviction was based on legally insufficient evidence in violation of [Kamienski's] rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution."[12]

Accordingly, we are presented with the single claim: whether Kamienski's murder convictions are supported by sufficient evidence. Kamienski's primary argument is that his murder convictions should be vacated under § 2254(d)(1) because the "evidence failed to prove all the required *actus reus* or *mens rea* elements of these offenses beyond a reasonable doubt."[13]

### III. Standard of Review

We review *de novo* a district court's grant or denial of a petition for a writ of habeas corpus. *Pazden v. Maurer*, 424 F.3d 303, 310 (3d Cir. 2005). However, like the district court, our review is circumscribed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable

---

[12] Additional motions followed that are not relevant to this appeal.

[13] Kamienski makes an alternative argument that his petition should be granted under 28 U.S.C. §§ 2254(d)(2) and (e)(1) because the appellate court's fact finding conclusions were unreasonable and clearly erroneous. Because we find that Kamienski's petition should be granted based on his first argument, we need not reach the second.

application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1). "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" *Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). On the other hand, "[a] state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Id.* at 234 (quoting *Williams*, 529 U.S. at 407). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). Thus, habeas relief requires not only a determination that the state court decision on the merits applied clearly established federal law erroneously or incorrectly, but also that the state court's application was unreasonable. *Id.* at 411; *see also Waddington v. Sarausad,* 129 S.Ct. 823, 831 (2009).

Kamienski argues that the state court unreasonably applied *Jackson v. Virginia*'s constitutional requirement that every element of a crime be established beyond a

16

reasonable doubt. 443 U.S. 307, 316 (1979) ("*Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof - defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."). A conviction will withstand a challenge under *Jackson* if, when "viewing the evidence [in the light] most [favorable] to the government, there is substantial evidence to support the jury's guilty verdict." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988);

In a habeas proceeding, however, we do not simply conduct a *de novo* review of the state court's application of that rule. Rather, we must review its sufficiency-of-the-evidence decision under the highly deferential standard of AEDPA. Our task, therefore, is to determine whether, viewing the evidence in the light most favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Kamienski was guilty of felony murder or first-degree murder.

## IV. Discussion.

The New Jersey Code defines felony murder as follows:

criminal homicide constitutes murder when . . . (3) It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape or terrorism . . . . and in the course of such crime or of immediate flight therefrom, any person causes the

17

death of a person other than one of the participants

N.J.S.A. 2C:11-3(a)(3). Here, the state's theory was that all three defendants were guilty of felony murder because the killings occurred in the course of a robbery. A killing in the course of a drug deal would not qualify as felony murder under New Jersey's statute, because distribution of illegal drugs is not one of the predicate felonies listed in the New Jersey statute defining felony murder. Thus, for Kamienski to have been guilty of felony murder, the state had to produce sufficient evidence to allow a reasonable juror to conclude beyond a reasonable doubt that he knowingly participated or aided in the commission of a robbery.

The state also charged Kamienski and Alongi with first degree murder based on their roles as Marsieno's accomplices. Under N.J.S.A. 2C11-3a, first-degree murder occurs when "the actor purposely causes death . . . . or . . . [t]he actor knowingly causes death." "Purposely" is defined as follows:

> A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist.

N.J.S.A. 2C:2-2. "A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain

18

that his conduct will cause such a result."  N.J.S.A. 2C2-2b(2).

The New Jersey Crimes Code specifies that "a person is legally accountable for the conduct of another person when . . . he is an accomplice of such other person in the commission of an offense."  N.J.S.A. 2C:2-6(b)(3).

> A person is an accomplice of another person in the commission of an offense if: (1) With the purpose of promoting or facilitating the commission of the offense; he (a) Solicits such other person to commit it; (b) Aids or agrees or attempts to aid such other person in planning or committing it. . . .

N.J.S.A. 2C2-6(c).  New Jersey's Supreme Court has instructed that "[f]or both the accomplice and his partner to be guilty, 'it is essential that they shared in the intent which is the crime's basic element." *State v. White*, 484 A.2d 691, 695 (N.J. 1984); *see also State v. Torres*, 874 A.2d 1084, 1092 (N.J. 2005).  Thus, to find Kamienski guilty as an accomplice to first-degree murder, the state must show that Kamienski shared the specific intent to kill the DeTournays.

The state has identified copious evidence that Kamienski was involved in the sale of cocaine from the DeTournays to Marsieno and Alongi, and the government clearly proved that he was, even though Kamienski testified in his own behalf and denied all involvement.  The jury clearly disbelieved his blanket denial, and the jury's conclusion that Kamienski brokered a cocaine sale between the DeTournays and Marsieno is supported by overwhelming evidence.

Kamienski introduced the DeTournays to Marsieno knowing they were looking for a drug buyer, and he vouched for the actors involved in the transaction, and helped

19

arrange the sale of cocaine. There is also more than sufficient evidence to allow the jury to conclude that Kamienski was involved in disposing of the DeTournays' bodies and covering up their murders.[14] However, the state has not identified any direct or circumstantial evidence that would allow a reasonable jury to conclude that Kamienski knew of Marsieno's intent to rob and/or murder the DeTournays before Marsieno shot them. Moreover, there is nothing other than rank speculation to suggest that he shared Marsieno's intent to rob and/or murder the DeTournays.

As noted above, the state's murder theory against Kamienski had been based on some abstract notion that the crime of murder is a continuing offense that includes attempts to dispose of the victim's body. That is a theory that is as unique as it is baseless and the state has not pursued it on appeal. Rather, the state now argues that the evidence was sufficient to prove that Kamienski knew of Marsieno's plans to kill the DeTournays and that he assisted by ensuring that Duckworth was not a witness to the crime.

Deference to a jury verdict, even under AEDPA's deferential standard, does not allow rank speculation to substitute for proof beyond a reasonable doubt. Ironically, the prosecutor's closing argument to the jury and post trial representations to the court are the most accurate assessment of the evidence the government produced at trial. The prosecutor who tried this case candidly conceded that the state had not proven either the

---

[14] The state did not charge Kamienski with being an accessory-after-the-fact for his role in hiding the DeTournays' murder, nor was he charged with obstruction of justice.

20

murder or felony murder charge against Kamienski, and we agree.

As noted earlier, the prosecutor told the jury in closing:

> Am I going to say does Paul Kamienski knew that they're going to get killed? I don't think so. Not from the evidence and testimony that I've heard. Paul Kamienski is there because he is part and parcel, he put this drug deal together, he made it work, he was there.
>
> ***
>
> He was there. He never-I'll say this, he never expected it to happen, he didn't expect them to be murdered. . . . but it happened. And he was there and he helped dispose of the bodies.
>
> ***
>
> I've indicated to you that I don't think that Paul Kamienski - - I don't think that [he] was a part of a conspiracy to murder those people, I think he very clearly was a part of the conspiracy, that second conspiracy to possess that cocaine with intent to distribute it.

The prosecutor made a similar remark to the court while opposing Kamienski's motion for a judgment of acquittal or a new trial. He agreed with the judge's observation that: "prior to the afternoon of the 19th there was nothing suggesting that [Kamienski] knew of and agreed to assist in or conspired to commit a robbery or a murder . . . [a]nd the jury so found."

This case is therefore a bit of a paradox. While arguing for a conviction of first degree murder and felony murder, the prosecutor conceded that the evidence did not establish that Kamienski had the mental state required for a conviction of first degree murder or that he had the knowledge required for a conviction of felony murder.[15] The

---

[15] It is not clear whether these admissions rise to the level of a judicial estoppel that would now preclude the government from taking a contrary litigation stance and now

21

trial judge who saw all of the witnesses and heard their testimony agreed that the government had not proven either charge beyond a reasonable doubt and entered a judgement of acquittal for Kamienski on both of those charges. Although the Appellate Division subsequently reinstated those convictions, our examination of this record convinces us that the Appellate Division's decision was an unreasonable application of clearly established Supreme Court precedent requiring proof of each element of a crime beyond a reasonable doubt.

We realize that "[i]nferences from established facts are accepted methods of proof when no direct evidence is available. It is [nevertheless] essential . . . that there be a logical and convincing connection between the facts established and the conclusion inferred." *United States v. Bycer*, 593 F.2d 549, 550 (3d Cir. 1979). When we asked the state to provide a supplemental brief on appeal identifying the evidence from which a jury could reasonably find Kamienski's shared intent to rob and/or murder (or assist in those crimes) the state repeatedly directed us to evidence showing his complicity in the drug deal or evidence showing his involvement in the disposal of the bodies after the murders

---

insisting that its evidence established Kamienski was guilty of murder and felony murder beyond a reasonable doubt. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ("The basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."). However, since Kamienski does not claim that the government's prior concession precludes it from arguing that the evidence was sufficient to convict Kamienski of murder and felony murder on appeal, we need not explore that issue.

22

had been committed. Neither is sufficient to sustain Kamienski's murder convictions.

At argument before us, the state stressed that Kamienski had sequestered Duckworth on the day the drug deal was to be struck and invited us to connect dots that would reveal a picture of his knowledge of the robbery Marsieno was apparently planning and Kamienski's shared intent to kill the DeTournays. However, based on our review of the evidence, the picture is simply not there and its existence can not be inferred absent the kind of guesswork that due process prohibits. Indeed, we can not accept the state's view of the evidence without choking all vitality from the requirement of proof beyond a reasonable doubt.

The government's arguments to the contrary rely not on inferences but on speculation. Although Kamienski and Duckworth had used cocaine together in the past, jurors must speculate to conclude that Kamienski's attempts to remove her from the scene of a very substantial cocaine deal on September 19th suggest anything more than his reluctance to have her witness the only major cocaine transaction he was involved in during their relationship (at least there was no evidence of any other large cocaine transaction).[16] "[I]f the evidence tends to give equal or nearly equal circumstantial

---

[16] We note that the state must rely on an inference to even place Kamienski at the scene when the shootings took place. At trial and on appeal, the argument was that because Kamienski took the unusual step of separating himself from Duckworth at the time designated for the drug deal and because he later told her that he "couldn't control what happened," he must have witnessed the shootings. While the use of inference to conclude Kamienski was present when the DeTournays were shot is permissible, the state must show more than presence to convict for murder.

23

support to guilt and to innocence . . . reversal is required: When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt." *See United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998)  (internal quotation marks and citations omitted); *see also United States v. Wexler*, 838 F.2d 88, 92 (3d Cir. 1988) (vacating conviction for conspiracy to transport hashish where "the evidence is just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime").

This record does not contain evidence that would allow an inference that Kamienski purposely or knowingly assisted Marsieno in killing the DeTournays. Marsieno was clearly the "trigger man," and there is nothing to suggest that Kamienski had any part in actually causing the DeTournays' death or that he even knew that Marsieno intended to bring a gun to the drug deal.  Nor is there any evidence to support an inference that Kamienski knew Marsieno had a gun and did not intend to pay for the drugs he was trying to get from the DeTournays.  Kamienski's mere presence at a meeting the night before in the bar of the Holiday Inn cannot supply that inference because there is no evidence of  the substance of the conversation among those involved in the drug transaction.  *See United States v. Cooper*, 567 F.2d 252, 254 (3d Cir. 1977) (vacating conspiracy conviction where record contained no evidence to show defendant-passenger knew contents of locked trunk compartment contained marijuana).  Although Marsieno had the briefcase containing a gun and no cash when Jeanne Yurcisin picked him up from

24

the bar that night at 8:00 pm, there is nothing to support an inference that Kamienski knew that Marsieno was only bringing a gun and no cash. Jeffrey, the drug courier, testified that he was told by the DeTournays on the 18th that the people buying the cocaine were "still getting their money together." To the extent Kamienski was involved in the actual exchange, the evidence only allows an inference that Kamienski believed, like the DeTournays, that Marsieno intended to pay for the cocaine he was to buy the next day.

We realize, of course, that Kamienski received cocaine from Marsieno at no charge after the murders. The government argues that this should be viewed as "hush money," a reward for Kamienski's involvement in the murders, or payment of his share of the robbery proceeds. However, even if the jury inferred that the cocaine was given to buy Kamienski's silence, it would still not establish knowledge of a robbery or murder before Marsieno killed the DeTournays. Following the killings, Marsieno had every reason to keep Kamienski happy and quiet, and the record can not be stretched to infer that Marsieno's gifts of cocaine to Kamienski reflect anything more. *See Ortega Reyna, supra*.

We realize, of course, that each strand of evidence need not establish guilt beyond a reasonable doubt, nor even support an inference of guilt by itself. Rather, we must view each strand as it is connected to the whole and determine if the totality of evidence, viewed in the light most favorable to the government, establishes guilt beyond a

25

reasonable doubt. Nevertheless, the web of evidence the government produced here simply does not allow a reasonable juror to conclude that Kamienski was guilty of murder or felony murder beyond a reasonable doubt. To paraphrase the prosecutor at trial, Kamienski "was [not] part of a conspiracy to murder these people. [The evidence does establish] very clearly [that] he was a part of the . . . conspiracy to possess . . . cocaine with intent to distribute it," but that is all he should have been convicted of.

Accordingly, we are convinced that the Appellate Division's conclusion regarding the sufficiency of the evidence underlying Kamienski's convictions was erroneous; the more difficult question is whether it was also "unreasonable" under AEDPA.[17] Although the sufficiency question is legal one, the answer requires close scrutiny of the record and an assessment of the evidence produced for each offense of conviction and for each defendant. As we have noted, there was more than ample evidence of Kamienski's role

---

[17] It is not clear whether the Appellate Division's conclusion that the state produced sufficient evidence to convict Kamienski of murder and felony, was merely *dicta* and therefore not entitled to AEDPA deference. The court stated: "[t]hese appeals raise two significant issues: (1) . . . *voir dire* . . . and (2) whether an acquittal on a conspiracy to rob and to murder precluded a conviction on those substantive offenses as an accomplice." 603 A.2d at 80. However, after summarizing the government's evidence (as set forth above), the court concluded that: "[t]he jury could have believed that although Kamienski was not part of an agreement or conspiracy to rob the DeTournays . . . or to murder them, he did purposefully lend assistance and aid to Marzeno in the commission of the robbery and murders. It was up to the jury to determine the meaning and significance of Kamienski's conduct." *Id*. at 93. Accordingly, since the state court opined that the evidence was sufficient to convict Kamienski of murder and felony murder, we will assume *arguendo* that its conclusion is entitled to AEDPA deference whether or not the conclusion was an actual "decision on the merits," or mere *dicta*.

26

in brokering a drug transaction. However, the Appellate Division conflated that proof into its inquiry into evidence of murder and felony murder. Doing so was not only error, it was unreasonable; it allowed Kamienski to be convicted on something less than proof of "every element of *the* offense" of conviction beyond a reasonable doubt. *Jackson*, 443 U.S. at 316 (discussing *Winship*).

The Appellate Division also unreasonably applied the standard governing when inferences may be relied upon to establish elements of a criminal offense beyond a reasonable doubt. That standard requires that the inference in question must be "more likely than not to flow" from the facts already established. *Leary v. United States*, 395 U.S. 6, 36 (1969). The "more likely than not standard" is well established. It cannot be satisfied here because the record simply does not allow a reasonable juror to infer that Kamienski intended that the DeTournays be robbed or killed. Thus, the district court erred in concluding that the state court's decision to reinstate Kamienski's convictions for murder and felony murder was a reasonable application of Supreme Court precedent to the facts of this case.

## V. Conclusion

Accordingly, for all the reasons we have set forth above, we will reverse the district court's order denying habeas relief and remand to that court for it to issue the writ.

27