RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0198p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————

ANDREW NEAL DAVIS,

*Petitioner-Appellant,*

*v.*

No. 14-6205

WAYNE CARPENTER, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:11-cv-00343—Todd J. Campbell, Chief District Judge.

Argued: July 29, 2015

Decided and Filed: August 20, 2015

Before: GILMAN, COOK, and KETHLEDGE, Circuit Judges.

—————————

**COUNSEL**

**ARGUED:** Andrew C. Brandon, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Jennifer Lynn Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Andrew C. Brandon, Mariah A. Wooten, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Jennifer Lynn Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

—————————

**OPINION**

—————————

KETHLEDGE, Circuit Judge. Andrew Davis was tried in Tennessee state court for murdering his fiancée's infant son, who sustained fatal skull fractures while in Davis's care. His defense was that he dropped the child accidentally. The jury convicted Davis and the court

1

sentenced him to life in prison.  Davis later filed a federal habeas petition, arguing that his attorney provided ineffective assistance.  The district court denied the petition.  We affirm.

I.

In 2000, Davis was engaged to Jennifer Chilton, who had an eight-month old son named Caine McPeak.  (Davis was not Caine's father.)  On January 27, Davis was at Chilton's apartment near Nashville, Tennessee.  Caine was fussy that morning; eventually Davis grew frustrated and pushed Caine across the floor toward Chilton, who told Davis to be more careful with her baby.  Davis got up and left the room.

Chilton left to run an errand later that day, leaving Davis to watch Caine.  A half-hour later, Chilton called Davis to ask whether Caine had fallen asleep.  Davis said that something was wrong:  Caine was not responding to Davis's touch.  Chilton asked a friend, Shannon Monticello, to check on the baby.  Chilton then called Davis again.  Davis held Caine up to the phone, and Chilton could hear the child gasping for breath.  She rushed home.

Monticello arrived at the apartment, went upstairs, and found Caine in his crib.  He was limp, his pulse was weak and erratic, his eyes were rolled back in his head, and he was not breathing.  She thought he looked dead.  Davis said that he "had just laid [Caine] down for a nap[,] came in there and he was like that."  Monticello immediately called 911.  The dispatcher said that paramedics were on their way and told Monticello to begin CPR.

Chilton reached the house after the paramedics.  When she saw her son, she slumped to the ground, "bawling and frantic."  Again Davis said he did not know what happened to Caine. The paramedics rushed the child to a local hospital, where he was airlifted to Vanderbilt Medical Center.  There, doctors found that Caine had three complex skull fractures, massive internal bleeding, retinal bleeding in both eyes, and a torn frenulum (the membrane that connects the lip to the gums).  Caine died shortly thereafter.

The police took Davis back to the apartment and asked him what happened.  Davis insisted he had not dropped Caine and claimed to have no idea how the child had been injured. Outside a neighbor's apartment, the police found a trash bag with a wet washcloth and Caine's shirt inside.  When the police confronted Davis about these items, he admitted that he had used

the rag to wipe blood out of Caine's mouth.  Davis said that he threw the rag and shirt in the trash because they had been "soaked" with blood.

For weeks thereafter, Davis insisted he had not dropped Caine.  Instead, on several occasions, Davis told Chilton that Caine must have been hurt at the home of Caine's father.  Davis also told his lawyer, Edward Yarbrough, that Caine might have fallen off a coffee table.  Later, Davis told Yarbrough that Caine must have been injured in an "incident involving the crib."

Eventually, Davis was indicted for murdering Caine.  At trial, in contrast to what he had said before, Davis testified that he had dropped the baby accidentally.  A medical expert, Dr. Charles Harlan, testified that Caine's injuries were consistent with that testimony.  But the prosecution's cross-examination of Harlan was brutal:  on 15 occasions, Harlan responded that "on the advice of [his] attorney," he could not answer questions about allegedly misleading testimony (for which he eventually lost his medical license) that he had given in other criminal trials.

Meanwhile, all of the doctors who had treated Caine testified that his death could not have been an accident.  For example, Dr. Ellen Clayton testified that Caine's "injuries were not consistent with a fall on to a carpeted surface," that a torn frenulum is "generally inflicted rather than accidental," that "bilateral retinal bleeding is almost never present in any cases other than child abuse cases," and that Caine's "three separate complex fractures" could not have been caused by "a short fall." *State v. Davis*, 2004 WL 1562544 (Tenn. Ct. Crim. App. July 9, 2004) at *6-7.  Dr. John Gerber's testimony was even stronger.  Gerber had performed the autopsy and ruled Caine's death a homicide. *Id.* at 7.  At trial, he testified that "he would not expect to see the types of injuries suffered by [Caine] on a child who was dropped from a height of six feet to a carpeted surface," that Caine's injuries were of a type "generally inflicted by the caregiver," and that, "[i]f [Caine] had been dropped and struck his head on a hard object before hitting the floor, [he] would have incurred [only] one linear fracture." *Id.*  Since Caine had instead incurred three complex fractures, Gerber testified, Caine probably received "two, and maybe three, separate blows" to his head:  "a direct blow to the side" and another to the back. *Id.*  Thus, Gerber concluded, Caine's "injuries were inconsistent with [Davis's] explanation that he

accidentally dropped [Caine] on to the carpet." *Id.* Despite this testimony, the jury was unable to reach a verdict, so the court declared a mistrial.

After the first trial, Dr. Harlan decided that he did not want to testify at a second. Yarbrough tried to find another expert, enlisting Harlan's attorney to help, but was unable to find an expert willing to take the case. So Davis went to the second trial without an expert. The jury convicted him of felony murder and aggravated child abuse, and the trial court sentenced him to life in prison plus 22 years. The Tennessee appellate courts affirmed on direct review.

Seven years later, Davis moved for post-conviction relief in the state trial court. He argued among other things that Yarbrough had provided constitutionally ineffective assistance when he failed to retain a medical expert to testify during Davis's second trial. The court held an evidentiary hearing, during which Yarbrough testified that he of course realized that he needed an expert. The problem, he said, was that he could not find an expert willing to testify in support of Davis's defense. Yarbrough testified that he and Harlan's attorney, Dan Warlick, had contacted several experts, but none were willing to say that Caine's injuries could have been caused accidentally. As a result, Yarbrough said, he had no choice but to proceed without an expert.

During the evidentiary hearing, Davis called Dr. Janice Ophoven to the stand. She said that, in her opinion, an accident could have caused Caine's injuries. She also opined that other doctors in her field would have been willing to say the same thing.

The trial court ultimately denied Davis's ineffective-assistance claim, holding that Yarbrough's efforts to locate an expert were not constitutionally deficient. The Tennessee Court of Appeals affirmed, and the Tennessee Supreme Court denied review. Davis later presented the same claim in a petition for federal habeas relief, which the district court denied. This appeal followed.

## II.

We review the district court's decision de novo. *Mendoza v. Berghuis*, 544 F.3d 650, 652 (6th Cir. 2008). The Tennessee Court of Appeals adjudicated Davis's claim on the merits. Thus, to obtain habeas relief, Davis must show either that the state court made an "unreasonable

determination of the facts" or that the court reached a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Davis's first challenge is factual: he argues that the state court unreasonably determined that Yarbrough "attempted to find an expert" and that "all the experts he contacted refused to participate." *Davis v. State*, 2010 WL 2787700 at *9 (Tenn. Crim. App. July 14, 2010). But Yarbrough said precisely those things at the post-conviction hearing: he testified that he tried to find an expert, that he personally contacted one or two potential candidates, and that they refused to testify. Davis presented no evidence to contradict that testimony. Thus, the state court did not make an "unreasonable determination of the facts" when it accepted Yarbrough's testimony as true. 28 U.S.C. § 2254(d)(1).

Davis also argues that the state court unreasonably applied the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). There the Court held that, to establish ineffective assistance, a defendant must first show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 683-88. Here the state courts held that Davis failed to make that showing. The question is whether any "fairminded jurist" could agree. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Davis contends that Yarbrough's representation fell below the *Strickland* standard when he failed to retain a medical expert to testify at Davis's trial. But Yarbrough tried to find an expert. During the post-conviction hearing, Yarbrough testified that he initially wanted Dr. Harlan to take the stand again at the second trial. When Harlan refused, Yarbrough obtained a continuance to gain more time to find a replacement. He also sought help from Warlick, who had attended medical school, knew doctors "all over the southeast," and thus "would be in a better position [to] locate a doctor." But Yarbrough and Warlick could not find any local doctors willing to testify. As Yarbrough put it, "this was not a case that a lot of [local] people wanted to get involved in."

So Yarbrough and Warlick broadened the scope of their search. The two men met "in [Warlick's] office or . . . in [Yarbrough's] office talking about the case and coming up with names of other doctors who we might check on." Yarbrough testified that Warlick talked to

almost all the doctors they identified, some from out of state. After hearing a summary of the first trial, however, none of these physicians was willing to testify in Davis's defense. Yarbrough also testified that he personally had contacted "one or two doctors" and tried to "persuade them to participate." Although he could not remember exactly which doctors he had contacted—the phone calls had taken place several years before—he thought he had spoken to one doctor in Mississippi and another in Illinois. But those doctors "did not feel that they could give testimony under oath that the injury to the child in this case could have resulted from a fall of the type being described by Mr. Davis."

Davis responds that these efforts were not enough, and that Yarbrough should have contacted more experts before going to trial without one. But "[e]ven [on direct] review, the standard for judging counsel's representation is . . . most deferential[.]" *Harrington*, 562 U.S. at 105. Thus, the question before the state courts was not whether Yarbrough "deviated from best practices or most common custom," but whether his "representation amounted to incompetence under prevailing professional norms." *Id.* (internal quotation marks omitted). And on habeas review the standard is more deferential still. The question before us is whether any "fairminded jurist" could agree with the state courts that Yarbrough satisfied the reasonableness standard set forth in *Strickland*. *Id.* at 101.

That standard is a general one, governing a great blue-water of attorney conduct: from pre-trial discovery to plea-bargaining, from in-court trial tactics to post-verdict motions, from direct appeals to post-conviction challenges. The Supreme Court has charted only parts of that expanse. For example, the Court has made clear that an attorney provides ineffective assistance if she fails to "inform her client whether his plea carries a risk of deportation." *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010). Likewise, an attorney provides ineffective assistance if he disregards a defendant's "specific instructions" to file a notice of appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). And an attorney is ineffective when the reason he failed to challenge a search is that he neglected to investigate whether a search occurred in the first place. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986).

Cases like these serve as navigation buoys, marking the points on which courts have foundered in the past—and thus should not approach again. If a defendant shows that his

attorney failed to tell him about a potential plea deal, for example, then a state court should know that it cannot hold that counsel's performance was reasonable nonetheless. *See Missouri v. Frye*, 132 S.Ct. 1399, 1408 (2012). And if a state court were to take that course anyway, we would say that no fairminded jurist would have done the same.

But here the Tennessee courts found themselves in open water. The Supreme Court has never reached the specific questions that the Tennessee courts answered in this case: how many experts must an attorney contact before proceeding without one, what kinds of outside advice can the attorney rely upon, and ultimately how hard must he try. The only buoy in sight, far off on the horizon, was the Court's guidance in *Strickland* itself that counsel's efforts must be within "the wide range of reasonable professional assistance[.]" 466 U.S. at 689. That rule is as general as they come. And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The Tennessee courts stayed within their leeway here. The question before us on habeas review is simply whether there is "any reasonable argument" that Yarbrough's efforts to find an expert were professionally reasonable in the broad sense of that term as used in *Strickland. See Harrington*, 562 U.S. at 105. There is such an argument: Yarbrough tried to convince Harlan to testify at the second trial, worked side-by-side with Warlick to find another expert when Harlan refused, and (in addition to Warlick's calls to doctors) called one or two doctors himself. That is not to say that Yarbrough's efforts were exemplary: to the contrary, he likely could have done more than he did. In the absence of any guidance from the Supreme Court as to how hard an attorney must work to find an expert, however, a fairminded jurist could conclude that Yarbrough's efforts fell in the permissible zone between "best practices" and outright incompetence. *Id.* at 102. Thus the Tennessee courts did not unreasonably apply *Strickland.*

Davis responds in several ways, the first being that Yarbrough should not have relied "entirely on Warlick" to locate an expert. But Yarbrough relied on Warlick only partially: although Warlick took the lead on identifying potential experts, the two men worked together to find additional experts and persuade them to testify. And Yarbrough personally tried to persuade one or two of those experts after Warlick failed to do so. More to the point, nothing in *Strickland* or any other Supreme Court case suggests that an attorney provides constitutionally

deficient representation when he relies upon another attorney—particularly one with greater contacts in the relevant field than he has—to help locate an expert witness. Fairminded jurists could therefore see this issue differently than Davis does.

Second, Davis contends that Yarbrough should not have relied on Warlick because, as Harlan's attorney, he had a "potential conflict of interest with Mr. Davis." Pet'r Br. at 64. At the time of Davis's second trial, Harlan faced criminal charges for providing misleading testimony on behalf of other defendants in other trials; and in Davis's view, Warlick therefore had a "disincentive" to find an expert and thereby "undermine [another] State prosecution." Pet'r Br. at 66. But an attorney can help another to "undermine [a] prosecution" whenever he chooses, so long as he does not harm his own client's interests in doing so. And it is hard to see how Warlick's efforts to help Davis could have hurt Harlan. Moreover, Yarbrough testified that Warlick and Harlan *both* seemed "motivated to help" find a replacement expert, further refuting Davis's contention that Warlick was somehow sandbagging on Harlan's behalf. Suffice it to say that a fairminded jurist could think that Yarbrough's decision to work with Warlick was a professionally reasonable one.

Third, Davis contends that Yarbrough mistakenly believed that he could present experts only from Tennessee or neighboring states, and thus limited his search to that area. But Yarbrough's own testimony refutes that contention. Specifically, though Yarbrough admitted that he and Warlick initially "spent some time talking about" whether they were limited to nearby experts, Yarbrough also testified they quickly realized they were not and thus expanded their search accordingly.

Fourth, Davis contends that Yarbrough should have provided potential experts with the entire case file, rather than allow Warlick to summarize the file for them. But Warlick's summary was detailed; and Davis points to no Supreme Court case (or any other authority) suggesting that the detailed summaries were not enough under *Strickland*.

Fifth, Davis contends that Dr. Ophoven's testimony—specifically, that she and other experts would have been willing to testify that Caine's death might have been an accident—shows that Yarbrough could have found a medical expert who was willing to testify for the defense. But one can grant that conclusion and yet deny Davis's claim on habeas. The question

before us is not whether Yarbrough could have located a willing expert, but whether a fairminded jurist could think that Yarbrough tried hard enough to find one. We have already explained why a fairminded jurist could think that.

Finally, Davis contends the state courts "totally disregarded" Ophoven's testimony that Yarbrough could have found an expert. The implication, Davis seems to suggest, is that we should give the state-court decision less deference than *Harrington* otherwise requires. But *Harrington* itself refutes that suggestion. In habeas cases, we review the state court's "decision," not the court's intermediate reasoning. *See Harrington*, 562 U.S. at 101. For our task is to "determine what arguments or theories supported" the state-court decision or "*could have supported*" it; and then to determine whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Id.* at 102 (emphasis added). Thus, so long as the state courts reach a *decision* that reasonably applies Supreme Court precedent—however deficient some of the court's reasoning might be—we must deny the writ.

The district court's judgment is affirmed.