NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0532n.06

No. 15-3605

FILED

Sep 14, 2016

DEBORAH S. HUNT, Clerk

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

AARON A. GIPSON,

    Petitioner-Appellant,

v.

ED SHELDON, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE: SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.**

Petitioner-Appellant Aaron Gipson (Gipson) appeals the district court's judgment denying his habeas petition under 28 U.S.C. § 2254. Gipson was convicted by a state court jury of complicity to aggravated murder and complicity to aggravated robbery under Ohio law. The issue on appeal is whether the Ohio Court of Appeals unreasonably applied the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), and unreasonably determined the facts in concluding there was sufficient evidence of intent for those crimes. We AFFIRM.

## I. BACKGROUND

Gipson's convictions arise from the robbery and murder of Calvin Harper, Jr. at 2136 Parkview Boulevard, Sandusky, Ohio on March 11-12, 2008, as part of a drug deal between Harper and Thomas Ricks, the shooter. Gipson was allegedly complicit in the robbery and

murder by setting up the drug deal, introducing Ricks to Harper, acting as the getaway driver, and sharing in the proceeds. Gipson received a sentence of life in prison with parole after thirty years.[1]

## A. Facts

The State's theory was that Gipson and Ricks traveled from Detroit to Sandusky on March 11, with a plan to rob and murder Harper, that Gipson dropped Ricks off near Harper's residence between 5:30 p.m. and 5:45 p.m., and that Gipson picked Ricks up after the offense was committed. Chanel Harper, the victim's sister and Gipson's inmate friend, testified that Gipson and Ricks drove from Canton, Michigan to Sandusky, Ohio on the evening of March 10, 2008, visiting Harper's home before arriving at Chanel's. Chanel, owed Gipson some money for a drug debt. They played cards, along with Chanel's best friend, Crystal Pool. Gipson and Ricks left Chanel's home around 1:00 a.m. Chanel called Gipson the next morning, March 11. He told her that he was returning to Sandusky that day, March 11, and would bring her some marijuana. He never showed.

Chanel and Harper's mother, Queen Amison, testified that on March 11, at 2:30 p.m., Harper stopped by her house to pick up $3,000 she was holding for him, because "someone had some keys [cocaine] and he needed that money." Amison knew that her son dealt drugs. Amison said that she knew Gipson, treated him like a son, and that he called her "mother, ma."

---

[1] Ricks was tried in April 2010, was found guilty, and was sentenced to life imprisonment without possibility of parole. His conviction for aggravated murder and aggravated robbery was affirmed by the Ohio Court of Appeals on September 30, 2011, *see State v. Ricks*, 965 N.E.2d 1018 (Ohio Ct. App. 2011), but was reversed by the Ohio Supreme Court on September 5, 2013. The Ohio Supreme Court held that the admission of Gipson's "testimonial, out-of-court statements" inculpating Ricks in the crime was improper since Gipson did not testify. 995 N.E.2d 1181, 1183-84 (Ohio 2013). On retrial, Ricks was acquitted of both counts of aggravated murder, of one count of murder, and of aggravated robbery. The jury was unable to reach a verdict on a second count of murder, resulting in a mistrial on that count. Thereafter, Ricks pleaded guilty to conspiracy to murder (with a firearm specification) and burglary. He was sentenced to ten years in prison for the conspiracy charge, plus three years on the firearm specification, and three years on the burglary charge, for a total prison sentence of sixteen years.

Around 5:18 p.m. on March 11, Harper called Rhonda Farris, a neighbor and close friend, to collect the $20 she had asked to borrow earlier in the day. Farris noticed a large stack of money in Harper's house, which Harper said was worth about $20,000.[2] Farris knew that Harper was preparing for a drug deal and left. Chanel and Amison also called Harper several times that evening but received no response.

About half an hour later, Farris saw a man she later identified as Ricks mistakenly come to her door looking for Harper. At 5:42 p.m., Farris called Harper to alert him, but Harper told her that he was expecting this individual. After she saw Ricks leave, Farris called Harper again, but he did not answer his phone.

Jessica King, Harper's girlfriend, testified that she left Harper's house around 4:30 p.m. that day and went to Chanel's, because she knew that Harper was meeting with Gipson and another individual. King was supposed to spend the night, so she returned around 10:30 p.m. The doors were locked and King banged on the doors and windows, but she got no response. She called Harper multiple times that night but he did not answer.

The next morning, March 12, 2008, Farris called Amison. Amison knew that Farris had access to Harper's house and she asked Farris to check on Harper. Farris found his body and called the police.

Harper was pronounced dead by EMS at approximately 10:00 a.m. on March 12, 2008. Harper had two gunshot wounds to his head, described by the coroner as a homicide. The coroner set the time of injury between 5:42 p.m. and 5:53 p.m. on March 11, 2008, based on the information provided by the investigators. The police did not find any large sums of cash in the house. They found a digital scale with dried blood on it near Harper's body.

---

[2] The detectives testified that Gipson told them that Harper wanted to buy 4.5 ounces of cocaine, which at the going rate of $1,000 an ounce in Sandusky at the time, was to be a $4,500 deal. The $20,000 figure comes from Farris's testimony.

When Chanel heard about her brother's death on the morning of March 12, she named Gipson as a suspect. Prior to the murder Gipson and Chanel spoke frequently by phone. After the murder, Gipson refused to answer or return Chanel's calls (including 16 phone calls on March 12). Gipson changed his cell phone number on March 14, even though he had just changed it on March 7.

Cell phone records showed that Gipson and Harper spoke numerous times on March 11.[3] Gipson's cell phone records and cell tower data tracked the route that Gipson took from Canton, Michigan to Sandusky, Ohio and back on March 11, 2008. At 5:15 p.m. Gipson's cell phone registered at a cell phone tower near Port Clinton, Ohio. At 5:48 p.m., six minutes after Farris called Harper to tell him that Ricks was heading to his house, Gipson's phone registered to a cell phone tower at Bell and Campbell Street in Sandusky, Ohio, which Detective Gary Wichman estimated was roughly one-half mile from Harper's residence. At 5:52 p.m., Gipson's phone registered a phone call on a cell phone tower at State Route 2, heading out of the Sandusky area.[4]

At 7:06 p.m., when he arrived back in Michigan, Gipson called his wife. At 7:08 p.m., he called Stanley Pierce, his drug supplier. Gipson called his mother at 7:12 p.m. At that point he was heading towards downtown Detroit. He called his mother again, and this call hit off a cell tower northwest of the Greektown Casino near the Strathmoor Street residence where Ricks had been staying. He called his wife again at 8:02 p.m., on his way southeast towards downtown Detroit.

---

[3] First, Gipson and Harper spoke at 1:10 p.m., while Gipson was still at home. At 1:30 p.m., Gipson called Deotis Sears, Thomas Ricks' uncle. Ricks did not have a cell phone, and used Sears's phone. At that point, Gipson began moving towards Detroit. Harper called Gipson again at 1:31 p.m., 1:46 p.m., 2:01 p.m., 2:12 p.m., and 3:15 p.m. By 3:42 p.m., when his wife Lashay Epperson called, Gipson was heading south. Gipson received another call from Harper at 4:18 p.m. At 4:43 p.m., Gipson called Sears. At 5:15 p.m., as he was entering Port Clinton, Ohio, Gipson called Harper.

[4] Larry Carlisle, an engineer with Sprint Nextel, testified that the calling radius for the Campbell Street tower was "maybe a mile or two." Gipson's "contrary" evidence, based on Google Maps, *see* Pet'r's Br. at 24, was not presented to the jury and therefore may not be considered. *See Cullen v. Pinholster*, 563 U.S. 170, 180-82 (2011) (habeas review is limited to record before the state court).

Gipson later admitted to investigators that he owed Pierce money. He also told investigators that on March 11, the day of the murder, Pierce had gone to Gipson's mother's residence on Strathmoor Street looking for Gipson and that between 12:00 p.m. and 1:00 p.m., someone was pounding on his apartment door. In fact, on March 11, Gipson had called the Canton Police Department, and reported that a suspicious vehicle was circling his apartment.[5]

Surveillance cameras showed Gipson walking into the Greektown Casino at 8:13 p.m. on March 11. The casino tracked Gipson's bets and buy-ins through his Pantheon membership card. That night Gipson bought in for $1,150 and his average bet was $145. By contrast, his buy-ins on his three previous visits were $40, $100, and $0, and his average bets were $30, $33, and $25. Gipson remained at the casino for six hours and 48 minutes; his previous visits lasted for 80 minutes, 19 minutes, and three and one-half hours.

On March 19, 2008, Detectives John Orzech, Gary Wichman, and Mark Volz of Sandusky interviewed Gipson in Canton, along with Detective Michael Steckel of the Canton Police Department. Initially, Gipson denied traveling from Detroit to Sandusky, but changed his story when confronted with his cell phone records. Gipson admitted that he arranged a drug deal with Harper for March 11, but claimed that during the 5:15 p.m. call, Harper told him that he was "straight" (that he did not need any drugs), so Gipson turned around and went back to Detroit. Gipson said that he not involved in Harper's murder. Gipson said that on March 10 he learned that Harper wanted to purchase four and a half ounces of cocaine, and that Gipson had set up a meeting between Harper and Ricks for March 11. Gipson also told the officers that he planned to sell Chanel a pound of marijuana that day. Gipson told the officers that Ricks told him that he, Ricks, shot Harper. Gipson directed the detectives to Ricks's residence on Strathmoor Avenue in Detroit and identified Ricks to the officers.

---

[5] The 911 tape was played for the jury.

### B. Procedural History

### 1. State Proceedings

Gipson was indicted on May 9, 2008 for Harper's murder. He was charged with complicity to aggravated murder with prior calculation and design, pursuant to Ohio Rev. Code §§ 2903.01(A) and 2923.03(A)(2); complicity to aggravated felony murder, pursuant to Ohio Rev. Code §§ 2903.01(B) and 2923.03(A)(2); complicity to aggravated robbery, pursuant to Ohio Rev. Code §§ 2911.01(A)(1) and 2923.03(A)(2); trafficking in marijuana; and trafficking in cocaine.

Gipson was convicted by a jury of complicity to aggravated felony murder, complicity to aggravated robbery, complicity to trafficking in marijuana, and complicity to trafficking in cocaine. He was acquitted of complicity to aggravated murder with prior calculation and design. On July 13, 2010, Gipson was sentenced to a life term with eligibility for parole after thirty years for complicity to commit aggravated felony murder, with additional concurrent terms of ten years for aggravated robbery, five years for trafficking in marijuana, and ten years for trafficking in cocaine.

Gipson appealed his convictions. He raised five assignments of error, including a challenge to the sufficiency of evidence to support his complicity to aggravated murder and aggravated robbery convictions, the only claim at issue here. *See State v. Gipson,* No. E-10-038, 2012 WL 432851, at *1 (Ohio Ct. App. Feb. 10, 2012). The Ohio Court of Appeals rejected Gipson's insufficiency of evidence claim for the following reasons:

> {¶ 14} The record shows that at trial appellee presented extensive cell phone records that carefully tracked appellant's whereabouts throughout the night. Appellant argued a lack of direct evidence and disputed witness credibility.

> {¶ 16} The underlining inquiry we must resolve is whether a rational trier of fact could have found the disputed elements of the crime established beyond a reasonable doubt. *State v. Wilson*, 8th Dist. No. 84593, 2005–Ohio–511.

{¶ 17} We have carefully reviewed and considered the record of evidence. Appellant characterizes the witnesses in this case as, "a slew of drug dealing family members." However, we note that the fact that the family members were willing to reveal their own unlawful conduct in the course of this matter could reasonably be perceived as indicia of their credibility. The jury in this case found the statements by appellee's witnesses, including not only family members but also numerous police officers and experts, to be credible and sufficient for conviction.

{¶ 18} We find no evidence reflecting that the factfinder lost its way or created a manifest miscarriage of justice. On the contrary, we find that the record contains ample evidence in support of conviction.

*Id.* at *3. The court affirmed his convictions.

Gipson filed a motion for reconsideration, arguing his conviction was not supported by sufficient evidence, especially because the State had mistakenly found that Farris identified Gipson, instead of Ricks, as the man who came to her door at approximately 5:00 p.m. on the night of Harper's murder. In considering Gipson's complaint, the Ohio Court of Appeals responded that:

[A]ppellant suggests that this court determinatively based its ruling on one portion of the testimony of one eyewitness. . . . [W]e note that we reviewed and considered a wealth of evidence and testimony in support of our determination that appellant's conviction was not against the manifest weight of the evidence and was supported by sufficient evidence. Our decision referenced the supporting testimony of numerous witnesses, including police officers, experts and family members, underlying the conviction. Appellant's conjecture that we relied on one portion of the testimony of one eyewitness in determinative support of our ruling is misplaced and without objective support.

The Ohio Supreme Court declined jurisdiction.

Gipson filed a motion to reopen his appeal based on ineffective assistance of appellate counsel, but the court of appeals rejected his claims and the Ohio Supreme Court declined to hear his appeal.

## 2. Federal Proceedings

Gipson filed a petition for writ of habeas corpus, raising nine grounds for relief. The district court rejected all of Gipson's claims and declined to issue a certificate of appealability. This court granted it, limited to the sufficiency of evidence claim. We stated that "reasonable jurists could debate one part of this issue: whether the evidence was sufficient to show that Gipson shared Ricks' intent to commit a theft offense or commit murder." We noted that:

> Although the state showed that Gipson was with Ricks during the relevant time, further evidence as to Gipson's intent is sparse. The state did not show, for example, that Gipson knew that Ricks had a gun, spoke to others about his involvement or plan, or shared in the proceeds of the robbery. . . . Because reasonable jurists could debate the district court's conclusion with respect to the element of intent, Gipson is entitled to a certificate of appealability on this claim.

## II. JURISDICTION

This court has jurisdiction to review this appeal of a final order of the district court in a habeas proceeding pursuant to 28 U.S.C. § 2253.

## III. ANALYSIS

### A. Habeas Review

This court reviews a district court's denial of a petition for a writ of habeas corpus de novo. *Adams v. Bradshaw*, — F.3d —, 2016 WL 3244860, at *2 (6th Cir. 2016). The Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. §2254, applies here and limits our ability to grant relief to state prisoners unless the state court's decision was either (1) "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court, or (2) "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). A state court determination of a factual issue is

presumed correct unless the petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Gipson makes two basic challenges on appeal. First, he claims that the state court unreasonably applied the standard of *Jackson v. Virginia* because no trier of fact could have found the essential element of intent for either the aggravated murder or the aggravated robbery charge. Second, he argues that the Ohio Court of Appeals' decision is based on an unreasonable determination of the facts in light of the record evidence.

## B. Sufficiency of the Evidence

For a claim based on insufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The court must assume that the jury weighed the evidence, resolved conflicts in the testimony, and drew reasonable inferences. *Id.* Circumstantial evidence is sufficient to support a conviction as long as the jury is convinced beyond a reasonable doubt. *See Holland v. United States*, 348 U.S. 121, 139-40 (1954); *Tucker v. Palmer*, 541 F.3d 652, 657 (6th Cir. 2008) (and cases cited therein).

AEDPA and *Jackson* together create two layers of judicial deference: First, we must defer to the jury's rational conclusions drawn from the evidence. In other words, we may not set aside the jury's verdict on insufficiency grounds unless "no rational trier of fact could have agreed with the jury." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam)). Second, we must defer to the state court's decision rejecting a sufficiency of the evidence claim. Habeas relief is available only if

the state court's application of the *Jackson* standard is "objectively unreasonable." *Id.* (quoting *Cavazos*, 132 S. Ct. at 4).

Although sufficiency of evidence is grounded in the Fourteenth Amendment, the *Jackson* standard is to be applied with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.

Aggravated felony murder requires proof that the defendant had the specific purpose and intent to kill the victim while committing or attempting aggravated robbery. Ohio Rev. Code § 2903.01(B) ("No person shall purposely cause the death of another . . . while committing or attempting to commit . . . aggravated robbery."); *see also* Ohio Rev. Code § 2901.22(A) ("A person acts purposely when it is the person's specific intention . . . to engage in conduct of that nature."). "Purpose (*i.e.* intent) to kill is an essential element of aggravated murder." *State v. Herring*, 762 N.E.2d 940, 947 (Ohio 2002).[6]

Aggravated robbery requires proof that the defendant knowingly committed a theft offense and did so with a deadly weapon. Ohio Rev. Code § 2911.01(A)(1) ("No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall . . . [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"). "[T]he deadly-weapon element of aggravated robbery in R.C. 2911.01(A)(1) does not require a mens rea." *State v. Horner*,

---

[6] The element of specific intent to kill distinguishes aggravated felony murder from traditional felony murder. Purpose to kill is not an element of the latter; a conviction for felony murder will stand for a killing that is a proximate cause of another crime even though the defendant lacked any intent or purpose to kill. *See* Ohio Rev. Code § 2903.02(B). Instead, the relevant inquiry is whether the victim's death was a proximate result of the defendant's commission of another offense of violence. *State v. Salaam*, No. C-070385, C-070413, 2008 WL 4394731, at * 2 (Ohio Ct. App. Sept. 30, 2008).

935 N.E.2d 26, 33 (Ohio 2010). "[N]o intent beyond that required for the theft offense must be proven." *Id.*

"[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 754 N.E.2d 796, 801 (Ohio 2001). "[P]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Id.* (quoting *State v. Pruett*, 273 N.E.2d 884, 887 (Ohio 1971)). But the mere association with one who commits an unlawful act does not establish complicity; there must be evidence of a common purpose to commit a crime together. *State v. Coleman*, 525 N.E.2d 792, 796-97 (Ohio 1988). Mere presence at the scene of the crime does not establish that the accused is an aider and abettor. *State v. Widner*, 431 N.E.2d 1025, 1027 (Ohio 1982) (per curiam); *cf. Rosemond v. United States*, 134 S. Ct. 1240, 1248 (2014) ("To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

Gipson contends that there is no such evidence, direct or circumstantial, to establish that he shared Ricks's intent to rob and kill. He claims that there is no proof that Gipson had any idea that Harper would be robbed and killed. Specifically, Gipson points out that there were no eyewitnesses to Harper's murder, no jailhouse snitches, no forensic or blood evidence incriminating Gipson, and no admissions by Gipson of his culpability. Furthermore, there is no proof that Gipson had any desire to rob or kill Harper, or that Gipson was angry with Harper.

Ricks did not implicate Gipson. Finally, Gipson asserts that the State's evidence shows that Gipson did nothing to assist or encourage Harper's death because there is no evidence that: Gipson accompanied Ricks into Harper's house, Gipson had a weapon or took one into the house, Gipson stood guard in the house, or Gipson fled the scene.

Thus, according to Gipson, the evidence at most allows for inferences that he arranged a drug deal for March 11 with Harper and included Ricks, that he introduced Ricks to Harper on March 10 and vouched for him, and that he traveled from Detroit on March 11 expecting to consummate the deal.[7] Gipson speculates that Ricks, seeing Harper with the $20,000, robbed and killed Harper---"an impromptu crime of opportunity"---that occurred at some point from the time Ricks arrived at Harper's house on March 11 and 2:30 a.m. on March 12. Pet'r's Br. 36-37. He points out that the deputy coroner confirmed that the murder could have occurred as late as 2:30 a.m., and that a neighbor's testimony suggests that Harper was killed between 10:00 and 11:00 p.m., when she heard loud sounds like weights dropping on the other side of her bedroom wall.

The Warden responds that Gipson's specific intent to kill and rob Harper can be reasonably inferred from Gipson's presence at the crime scene, his companionship with Ricks, and his conduct after Harper had been killed.

First, as the Warden asserts, the evidence established that Gipson was actively present near the crime scene, creating an inference of shared intent in the crime. Gipson's phone records and cell tower data show that Gipson had numerous calls with Harper on March 11 and establish

---

[7] In his appeal brief Gipson argues that there is no proof that he traveled with Ricks on March 11; Ricks made his own arrangements to sell to Harper and had arrived alone at Harper's house before 5:00 p.m. for that purpose; and Gipson turned around and went home after Harper told him he did not need any drugs. Pet'r's Br. 36. Alternatively, he asserts that the evidence establishes at most that Gipson was the driver who transported Ricks to Sandusky and dropped Ricks off near Harper's residence. *Id.* at 37. Gipson also claimed in his opening statement that he came back to Sandusky on March 11 by himself.

that Gipson traveled from Canton, Michigan to Sandusky, Ohio, picking up Ricks along the way. At 5:15 p.m., the phone records reflect that Gipson's cell phone registered with a cell tower near Port Clinton, Ohio. At 5:48 p.m., Gipson's phone registered on a tower at Bell and Campbell streets, which Detective Wichman said was approximately one-half mile from Harper's residence. In other words, the cell phone records show that Gipson was in Sandusky, within several miles of Harper's residence at the time of the murder. At 5:52 p.m., Gipson's phone registered a phone call with a cell tower near State Route 2, consistent with heading out of town. This evidence refutes any speculation in Gipson's brief on appeal that Gipson did not travel all the way into Sandusky. And other witnesses testified that Harper planned to meet with Gipson and another individual to buy drugs on the day of the murder. Chanel testified that Gipson said he was coming to Sandusky on Saturday to bring her marijuana. King left Harper's apartment at 4:30 p.m. because she knew that he was meeting with Gipson and another individual. Queen Amison and Farris testified that Harper was gathering money in anticipation of a drug deal that day.

Next, Gipson's companionship with Ricks bolstered the State's showing of shared intent to rob and murder Harper. The evidence established that Gipson set up the drug deal between Ricks and Harper and introduced Ricks to Harper the night before the deal. But, as the prosecutor explained during closing arguments, "there w[ere] no drugs,". Indeed, there was no testimony establishing that either Ricks or Gipson carried any drugs with them to Sandusky on March 11. As the prosecutor posited, the jury could have inferred that Gipson "suckered" Harper into a large sale so Harper would gather a large amount of money. The fact that Gipson waited in the car and did not accompany Ricks into the house bolsters the reasonable inference that both men planned to rob and murder Harper. Thus, as the prosecutor asserted, it was

reasonable to infer that Gipson set up the bogus drug deal for the cash, sending Ricks in to commit the robbery and murder while he waited in the getaway car.

Finally, as the Warden explains, Gipson's conduct after the crime is also evidence of his intent. Cell tower data showed that after the murder, Gipson drove past the casino towards the Strathmoor street area in Detroit where Ricks had been staying before heading back downtown to the casino, establishing the inference that Gipson was with Ricks after the murder. Further, Gipson stayed longer and spent more money at the casino than on prior occasions, suggesting that he shared in the proceeds. Gipson counters that his betting habits on the night of March 11 and his three previous visits are not relevant to whether he shared Ricks's specific intent to rob and murder Harper. But they are sufficient to create an inference that he had more money than usual to spend as a result of the robbery. *See State v. Blymiller*, No. 2012CA00171, 2013 WL 3055377, at *4 (Ohio Ct. App. June 10, 2013) (finding sufficient evidence of the defendant's criminal intent where the defendant not only dropped off his codefendant immediately before the break-ins and picked him up afterwards, but also shared in the proceeds of the theft).[8]

Gipson's call to Stanley Pierce on the way back to Michigan is additional evidence of motive and shared intent.[9] Gipson admittedly owed Pierce money for a drug deal and had called police earlier that day because he was concerned about his safety. Although, as Gipson points out, there is no proof of what was said during Gipson's phone call to Pierce, it can be reasonably

---

[8] Gipson finds the Warden's reliance on *Blymiller* "perplexing," because the evidence of the defendant's complicity in that case included that he was seen by a witness at the location of the theft dropping off the principal and picking him up immediately after the theft occurred, on two occasions. *See Blymiller*, 2013 WL 3055377, at *1. Although there was no eyewitness in this case, other evidence, particularly the cell phone records, established that Gipson was at or near the scene of the crime.

[9] Gipson argues that his conviction for complicity to drug trafficking in marijuana and cocaine means that the jury "certainly believed drug transactions occurred that day," meaning that Gipson, too, could have believed the money came from the consummated drug deal and not from a robbery-murder Pet'r's Br. at 43-44. However, the trafficking offense may be committed by a knowing "offer" to sell drugs. The State proceeded on this theory. (jury instruction stating that "defendant knowingly aided, abetted, or conspired with another to commit the offense of knowingly selling or offered to sell a Schedule I controlled substance").

inferred that, given Pierce's actions earlier that day, Gipson called Pierce to let him know that he acquired the funds to pay the drug debt so that Pierce would stop threatening Gipson and his mother. He also called his mother shortly after the call to Pierce, presumably to reassure her that all was safe again. Finally, Gipson's contact with Harper's family after the robbery and murder is also indicative of Gipson's criminal intent. Before Harper's murder, Gipson spoke daily with Chanel. After the murder, he refused to take or return her numerous calls. He also cut off contact with Harper's mother, Queen Amison. And he changed his cell phone number again on March 14, two days after Harper's body was found.

Certainly, the jury could have decided that Gipson did not know Ricks planned to rob and/or murder Harper until after the fact. But it would also not be unreasonable for the jury to conclude that Gipson shared Ricks's intent to rob and murder Harper for the $20,000. From the evidence presented a reasonable juror could have thought: Why did Gipson drive Ricks back to Sandusky since he had introduced Ricks to Harper the night before? Why did Gipson wait in the car instead of accompanying Ricks into the home of his good friend? Why did Gipson depart so quickly with Ricks after Ricks met with Harper?[10] Why did Gipson cut off all communication with Chanel and Amison immediately after the murder? Why did Gipson call Pierce and then his mother so soon after the murder? From these facts a reasonable juror could have inferred that Gipson intended, along with Ricks, to rob and kill Harper for the $20,000, because Gipson needed money to pay off a debt to Pierce. The evidence is entirely circumstantial, to be sure. But the Supreme Court has held that "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence," and that it is sufficient as long as the jury is convinced beyond a

---

[10] Also dubious is Gipson's claim that when he called Harper at 5:15 p.m., Harper told him that he no longer needed any drugs. As the prosecutor explained in closing arguments, Farris testified that she saw the money just after 5:18 p.m., which means he had not yet purchased any drugs. Instead, as the prosecutor asserted, the more likely scenario is that Gipson called Harper at 5:15 p.m. to tell Harper that Ricks would making the delivery.

reasonable doubt. *See Holland*, 348 U.S. at 140; *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (stating that "we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required"). The *Jackson* standard does not require the Warden to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 326.

To Gipson, the absence of certain evidence means that there cannot be proof beyond a reasonable doubt. But "*Jackson* says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos*, 132 S. Ct. at 6 (quoting *Jackson*, 443 U.S. at 319). "It also unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, 443 U.S. at 326). Add to that "the deference to state court decisions required by § 2254(d)," it cannot be said that the Ohio Court of Appeals' decision is objectively unreasonable. *See id.* (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)) (and cases cited therein).

## C.     Determination of the Facts

Pointing to several errors and omissions in its decision, Gipson suggests that the Ohio Court of Appeals' decision involved an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). First, Gipson points out that the state court decision mistakenly stated that Farris identified Gipson rather than Ricks as the individual who came to her home. This is true. But Gipson notified the court of its error in his motion for reconsideration and the Ohio Court of Appeals refactored its sufficiency analysis, noting that it

"reviewed and considered a wealth of evidence and testimony" in support of its conclusion that Gipson's convictions were supported by sufficient evidence. The court explained that it relied on the testimony of "numerous witnesses, including police officers, experts, and family members." The court called Gipson's "conjecture" that it had "relied on only one portion of the testimony of one eyewitness in determinative support" of its ruling "misplaced and without support." Because the court was made aware of its error and factored it into its analysis, it cannot be said that the court relied on an unreasonable determination of the facts under AEDPA.

Next, Gipson claims the court "was off by 40 minutes" as to Ricks' arrival time at Harper's house. In its opinion, the Ohio Court of Appeals stated that Farris observed a man (Ricks) arrive at her house "[a]t approximately 5:00 p.m," but the trial evidence revealed that Ricks arrived moments before 5:42 p.m., because Farris testified that she made her warning call to Harper at 5:42 p.m. Furthermore, Farris also testified that Ricks called her at 5:18 p.m. to get the $20 she had asked to borrow and she went to collect it. On top of that, at 5:15 p.m., phone records reflect that Harper and Gipson spoke, while Gipson was "just entering Port Clinton," about 20-25 minutes west of Sandusky. However, the Ohio Court of Appeals expressly stated that the 5:00 p.m. time was an approximation, and it is within reasonable bounds of the record evidence actually cited by Gipson—that, based on Farris's warning call to Harper, Ricks arrived just before 5:42 p.m.[11]

Gipson also complains that, in addition to factual errors, the Ohio Court of Appeals' summary of facts omits a number of critical undisputed facts that are relevant to his insufficiency

---

[11] In his appeal brief Gipson relies on the Ohio Court of Appeals decision in Ricks's trial, which found that Ricks arrived between 4:00 and 5:00 p.m., *see State v. Ricks*, 965 N.E.2d 1018, 1021 (Ohio Ct. App. 2011), *rev'd* 995 N.E.2d 1181 (Ohio 2013). But this evidence was not before the Ohio Court of Appeals in this case, and therefore may not be considered in evaluating the reasonableness of its decision. *See Cullen,* 563 U.S. at 180-82 (holding that review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits; rejecting the petitioner's claim that the federal habeas court could consider evidence introduced in an evidentiary hearing).

claim. Specifically, he notes that the police admitted that there was no physical evidence linking Gipson to the crime scene, nor any eyewitness testimony placing him there. At most, the State's evidence placed Gipson a mile or two away from the scene, and always traveling in a vehicle. But lack of physical evidence does not render the evidence presented insufficient; instead it goes to weight of the evidence, not its sufficiency. *See United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005). And, as noted, it is clearly established that a jury's verdict may be based entirely on circumstantial evidence. *See Holland*, 348 U.S. at 139-40; *Desert Palace, Inc.*, 539 U.S. at 100.

Gipson also faults the Ohio Court of Appeals' failure to note that Farris was more than a neighbor, that she was Harper's good friend and assisted him in his drug trade by hiding drugs for him and acting as a lookout. Gipson adds that although she saw Ricks, she did not see Gipson near Harper's home on March 11, and did not see anyone drop off or pick up Ricks. But reviewing courts do not reweigh the credibility of witnesses. *See Lavender v. Kurn*, 327 U.S. 645, 652-53 (1946). Moreover, as the Warden asserts, the cell phone records, which placed Gipson within several miles of Harper's residence at the time of the crime, provided strong objective evidence of his presence at the crime scene.

Gipson criticizes the state appeals court's failure to mention the State's evidence that Gipson arrived at the Greektown Casino in downtown Detroit, two hours from Sandusky, at 8:13 p.m., and that no witness other than Farris provided any evidence linking Gipson to Harper's residence before 8:13 p.m. But this evidence does not give Gipson an alibi because the State proved through the cell phone records that Gipson was in Sandusky earlier in the evening when the crime occurred.

Gipson also attacks the court for failing to discuss the evidence concerning the time of Harper's death. The deputy coroner who performed the autopsy was unable to say when the gunshots that killed Harper were fired, and she admitted that she "ha[d] no way of knowing" when Harper suffered the gunshot wounds. The deputy coroner also said it was possible that the fatal wounds were administered as late as 10:30 p.m. on March 11 or as late as 2:30 a.m. on March 12. But the deputy coroner's answer was in response to hypothetical questions from defense counsel, and the coroner made clear that her opinion was not based on medical certainty but instead on possibilities. The 10:30 p.m. figure posited by Gipson is based on Harper's neighbor Mariah Russell, who testified that between 10:00 and 11:00 p.m. on the night of March 11, 2008, she heard a sound "like weights were dropping" coming from Harper's house, and then a second sound like a weight had bounced. Russell's bedroom shares a common wall with Harper's bedroom. Gipson hypothesizes that if these sounds were the shots that killed Harper and the sound of his body falling and landing on the space heater near the common wall, the shooting occurred much later than 5:42 p.m. and, more to the point, when Gipson was in Michigan. But Russell did not say that she heard gunshots (because she didn't know what a gunshot sounded like). Furthermore, she heard these sounds at the same time King said she was pounding on Harper's windows and doors to gain entry to his home. Finally, Farris saw Ricks leave the house well before 10-11 p.m.

**D. Unreasonable Application of Law Under § 2254(d) (1) and Unreasonable Determination of Facts Under § 2254(d)(2)**

Next Gipson focuses on the Ohio appellate court's failure to address Gipson's intent to rob and murder Harper. Gipson argues that this failure constitutes both an unreasonable application of *Jackson* and an unreasonable determination of the facts in light of the evidence presented. *See* Pet'r's Br 46. He notes that the court's brief discussion of the insufficiency issue

makes no mention of the State's burden to prove that Gipson shared Ricks's specific intent. He points out that none of Harper's family members or friends provided any evidence that Gipson knew or intended that Harper be robbed or murdered. None of the police witnesses did either; in fact the Sandusky Police Department detectives testified that Gipson denied being involved in Harper's robbery and murder, while admitting that he set up the meeting with Harper for March 11.

But, as the Warden points out, Gipson did not raise the issue of shared intent in his brief appealing his convictions. Rather, he challenged the credibility of the state's witnesses, the circumstantial nature of the case, the reliability of the cell phone evidence, and the police's failure to investigate other possible suspects. In any event, so long as there is a decision on the merits that reasonably applies Supreme Court precedent, we are not required to give the state court decision less deference merely because some of its reasoning might be deficient. *Davis v. Carpenter*, 798 F.3d 468, 475 (6th Cir. 2015) ("[S]o long as the state courts reach a *decision* that reasonably applies Supreme Court precedent—however deficient some of the court's reasoning might be—we must deny the writ." ), *cert. denied*, 136 S. Ct. 1466 (2016); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011) (stating that "determining whether a state courts decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning"). "For our task is to 'determine what arguments or theories supported' the state-court decision or '*could have supported*' it; and then to determine whether 'fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of' the Supreme Court." *Davis*, 798 F.3d at 475 (quoting *Harrington*, 562 U.S. at 101) (emphasis supplied by *Davis* court).

The Ohio Court of Appeals' application of *Jackson* was not objectively unreasonable because there was sufficient evidence—albeit circumstantial—to convict Gipson of the elements of complicity to aggravated murder and aggravated robbery beyond a reasonable doubt. *See* § 2254(d)(1). Furthermore, the record supports a factual finding that Gipson intended, with Ricks, to rob and murder Harper. *See* § 2254(d)(2). *See generally Rice v. Collins*, 546 U.S. 333, 342 (2006) ("The question whether a state court errs in determining the facts is a different question from whether it errs in applying the law."). As discussed above, evidence established that Gipson set up the drug deal between Ricks and Harper, was in the area at the time of the murder, and had a motive—his desire to repay his debt to Pierce.

Certainly, as Gipson ably argues throughout his brief, the evidence of intent is entirely circumstantial and different inferences could be drawn. But, as a habeas court, we are not allowed to do that. "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial . . . . This deferential standard does not permit . . . fine-grained factual parsing" by reviewing courts. *Coleman,* 132 S. Ct. at 2064 (internal citation omitted). And, as discussed, the Supreme Court has reminded federal habeas courts that we owe deference to a state court's application of the *Jackson* standard. Its opening remarks in *Cavazos* resonate here:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. —— –, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos*, 132 S. Ct. at 3-4. As *Cavazos* cautions, in light of the evidence presented, it would not be proper for this court to substitute its judgment for an Ohio jury on the question of Gipson's complicity to commit aggravated murder and aggravated robbery. *See id.* at 4, 7. Like *Cavazos*, "[d]oubts about whether [Gipson] is in fact guilty are understandable." *Id.* at 7. But like the Ninth Circuit in that case, "it is not the job of this [c]ourt . . . to decide whether the State's theory was correct. The jury decided the question, and its decision is supported by the record." *Id.*

### E. Analogous Cases

Gipson argues that factually analogous habeas cases demonstrate the objective unreasonableness of the Ohio Court of Appeals decision in this case. Gipson relies most heavily on *Kamienski v. Hendricks*, 332 F. App'x 740 (3d Cir. 2009), *cert. denied*, 130 S. Ct. 1168 (2010), which he claims is directly analogous to the circumstances here and supports his entitlement to relief under AEDPA. Kamienski was convicted of accomplice murder and felony murder under New Jersey law. The trial court granted his post-verdict motion for judgment of acquittal on the murder convictions, concluding that there was insufficient evidence to convict Kamienski of accomplice liability for either murder or felony murder. The state court of appeals reversed and reinstated Kamienski's murder convictions, finding sufficient evidence of accomplice murder.

The Third Circuit disagreed and granted the writ, holding that the state court of appeals unreasonably applied the *Jackson* standard. The Third Circuit found that evidence showing Kamienski's complicity in the drug deal and involvement in disposal of the bodies after the murders had been committed was not sufficient to sustain Kamienski's murder convictions. *Id.*

at 750. Specifically, it rejected the state's arguments that inferences of Kamienski's complicity in the murders could be drawn from circumstantial evidence of Kamienski's orchestration of the drug deal; his activities immediately before the murder, including the sequestration of his girlfriend; and his help in disposing of the bodies. *Id.* at 750-51.[12] The court also stressed that there was no evidence that Kamienski knew that the shooter had a gun and did not intend to pay for the drugs. *Id.* at 751. The Third Circuit held that Kamienski's sequestration of his girlfriend shortly before the shootings did not suggest anything more than his reluctance to have her as a witness to a major cocaine deal, and was not evidence of a shared intent to commit murder. *Id.* at 750. Furthermore, the state had to rely on an inference from this evidence to even place Kamienski at the scene of the crime. *Id.* at 750 & n.16 (stating that "[a]t trial and on appeal, the argument was that because Kamienski took the unusual step of separating himself from [his girlfriend] at the time designated for the drug deal . . . he must have witnessed the shootings"). The court held that "[w]hile use of inference to conclude Kamienski was present when [the victims] were shot is permissible, the state must show more than mere presence to convict for murder." *Id.* Furthermore, although not determinative of its sufficiency inquiry, the Third Circuit emphasized that the prosecutor "candidly conceded" in his closing argument to the jury and post-trial representations that the evidence did not establish that Kamienski had the mental state required for a conviction of first degree murder or that he had the requisite knowledge for a felony murder conviction. *Id*. at 749-50; 751-52. The state appellate decision was thus

---

[12] This further included several meetings between Kamienski and the shooter and his associate before the murder; the fact that he told his girlfriend shortly after the murder that "he couldn't control what happened" and that "Nick went first, Barbara didn't suffer"; that the bodies were seen on Kamienski's boat; and that the bodies were wrapped in blankets similar to those found on the boat. 332 F. App'x at 742-44. There was also evidence that Kamienski received free cocaine from the principal after the murders, which the government argued was hush money or payment of his share of the robbery proceeds. *Id.* at 751.

objectively unreasonable because it "conflated" proof of Kamienski's role in brokering a drug transaction with the evidence of murder and felony murder. *Id*. at 752.

Gipson claims that the same is true in this case: that the evidence and permissible inferences prove at most that Ricks walked into Harper's apartment by himself and committed the charged crimes, because there is no evidence that he and Gipson, the driver, formed an intent to kill *before* Ricks exited Gipson's car at 5:42 p.m.

*Kamienski* is of course not binding because it is not clearly established Supreme Court precedent. *See Renico*, 559 U.S. at 778-79; *see also Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012). And despite some factual similarities, it is distinguishable. Unlike *Kamienski*, there was solid evidence placing Gipson at or near the scene of the crime based on his cell phone records. Although presence alone cannot establish intent, it is one of the key elements for proving participation in criminal intent. *See Johnson*, 754 N.E.2d at 801. Furthermore, there was inferential proof of complicity based on cell phone records that Gipson was actively communicating with Harper on the day of the drug deal; drove the robber-shooter to the victim's home to carry out the crimes; was at or near Harper's residence when the murder occurred; acted as the getaway driver, beating a hasty retreat from the home of his good friend; and had a motive to murder, namely to pay back his debt to Pierce so Pierce would stop threatening him and his mother.

Gipson also cites other AEDPA habeas cases addressing claims of insufficient evidence that he claims are factually analogous and therefore "provid[e] a 'valuable reference point' when considering the reasonableness of a state court's application of Supreme Court precedent to a particular set of facts." *O'Laughlin v. O'Brien*, 568 F.3d 287, 305 (1st Cir. 2009) (quoting *Evans v. Thompson*, 518 F.3d 1, 10 (1st Cir. 2008)); *see also id.* at 308 (stating that "federal courts,

acting under the AEDPA regime, can hold in appropriate circumstances state court decisions to be objectively unreasonable when applying *Jackson*"); *id.* at 302-08 (holding that state court unreasonably applied *Jackson* where circumstantial evidence was insufficient to support convictions for burglary and armed assault inside victim's apartment because nothing of value was taken, savage beating of victim was inconsistent with the defendant's alleged motive of seeking money to buy crack cocaine, baseball bat found near apartment and connected to the defendant—although consistent with victim's injures—was not otherwise linked to crime, and evidence of the defendant's consciousness of guilt, namely his refusal to consent to police officers' swab of blood stain in his apartment, did not show guilt beyond a reasonable doubt); *Newman v. Metrish*, 543 F.3d 793, 794, 797 (6th Cir. 2008) (holding that the state court ruling was objectively unreasonable where prosecution failed to present sufficient evidence that the petitioner murdered a known drug dealer; although the state established that the petitioner planned to rob drug dealers for drugs or money, the victim was a known drug dealer who kept drugs in his freezer and that freezer was open and empty after the homicide, the petitioner and the victim had engaged in drug transactions in the past, the petitioner had a motive because he had seen the victim make a pass at the petitioner's girlfriend, and the petitioner had possessed and once purchased the murder weapon and a similar gun was seen in his home two weeks before the murder, evidence placing the petitioner at the "scene" was "conspicuously absent," leaving only a "reasonable speculation" that the petitioner was present); *Juan H. v. Allen*, 408 F.3d 1262, 1277-79 (9th Cir. 2005) (granting writ to a juvenile petitioner convicted of aiding and abetting a principal in first degree murder and attempted first-degree murder because the petitioner's lies about his presence at the crime scene and the fact that he fled the area were insufficient to support an inference that he aided and abetted the murderer, "interpersonal

tensions" between the petitioner and the victim did not create a sufficiently strong inference of motive and knowledge that the shooter (the juvenile petitioner's older brother) had planned to confront the victim while holding a firearm and fact that the petitioner stood behind his brother during the shooting did not establish specific intent to commit first degree murder); *Piaskowski v. Bett*, 256 F.3d 687, 691-93 (7th Cir. 2001) (granting the writ to a petitioner convicted of first-degree murder under conspiracy theory because the defendant's presence at the scene of the assault and murder was insufficient because he worked in the area, his statement that victim was missing was true when the defendant made it, and statement that something was "going down" was vague and did not refer to victim's murder). In each of these cases the habeas court found that the state's evidence was "conjecture" and speculation and not circumstantial evidence. For the reasons discussed above, reasonable inferences from Gipson's presence near Harper's residence at the time of the murder, his companionship with the shooter Ricks, his conduct both before and after the crime, and his motive distinguish this case from those cited by Gipson.

## IV. CONCLUSION

Rational persons can disagree that Gipson knew of and shared in Ricks's intent to kill Harper. *See Cavazos*, 132 S. Ct. at 4. But "*Jackson* takes for granted that reasonable minds may differ as to what conclusions a given set of facts will bear." *Newman*, 543 F.3d at 801 (Sutton, J., dissenting). Here, there is circumstantial evidence of Gipson's shared intent, and it cannot be said that no rational juror could find proof of that element. Furthermore, this court owes deference to the state court's application of the *Jackson* standard, even if we disagree with the jury's verdict. Thus, on this record, it cannot be said that the Ohio Court of Appeals' decision was objectively unreasonable. The judgment of the district court is AFFIRMED.